JAMES PHILLIP VAUGHNS, CSBN 124040
Law Offices of James P. Vaughns
6114 LaSalle Avenue, Suite 289
Oakland, California  94611
Telephone:	510-583-9622
Fax:	510-735-8658
Email:	vaughnslaw@aol.com

Counsel for Defendant
Rosman ARTEAGA-VASQUEZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ROSMAN ARTEAGA-VASQUEZ,<br><br>    Defendant. | No. CR 19-0287 CRB<br><br>**SENTENCING MEMORANDUM** |

### INTRODUCTION

On February 11, 2020, defendant Rosman Arteaga-Vasquez plead guilty to Count Five of the Indictment - 21 U.S.C. §841(a)(1) and (b)(1)(B) - Distribution of Heroin. The final Presentence Report ("PSR") has been received and sentencing is set for September 30, 2020.

While the PSR arrives at a recommended sentence of 60 months, USPO Goldsberry indicates that her 60 month recommendation is governed by the required mandatory minimum of the same duration. Had the man/min not been applicable, it is understood that her recommendation would have been lower.

For reasons stated below, the defense position is that a sentence of probation is appropriate.

CR 19-00287-CRB

# ARGUMENT

## District Courts Have Both the Authority and the Responsibility to Exercise Their Judgment and Discretion in Arriving at the Appropriate Sentence

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 128 S. Ct. 558 (2007), and *Gall v. United States*, 128 S. Ct. 586 (2007), dramatically altered the district court's role in sentencing. The Sentencing Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S. Ct. at 564. While "district courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. 264), district courts "may not presume that the Guidelines range is reasonable," *Gall*, 128 S. Ct. at 596-97; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). After *Booker*, "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. § 3553(a)). The Guideline range is only one factor for the district court to consider in making this judgment, and it may not be weighed more heavily than any other factor. *Id.*

In *Gall*, the Supreme Court held that appellate courts cannot require that "a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances." 128 S. Ct. at 591. The Court likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. Rather, it is within the district court's discretion to arrive at an appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range." *Id.* at 591.

**FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE**

The primary directive in 18 U.S.C. § 3553(a) is for sentencing Courts to impose a sentence which is sufficient, but not greater than necessary, to comply with the above objectives of sentencing. As noted, under *Booker*, sentencing courts must treat the guidelines as just one of a number of sentencing factors set forth in18 U.S.C. § 3553(a). In determining a minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider certain factors, particularly the following:

**(1) Characteristics of the Defendant**

Rosman Arteaga-Vasquez is a 35 year old single male from Honduras PSR, ¶42. He experienced poverty and domestic abuse during his youth. PSR, ¶42. As a result, he immigrated to the United States at age 18 after several desperate, but unsuccessful attempts. PSR, ¶45..

He has worked steadily since his arrival in the United States and has sent money he earned to his family in Honduras. PSR, ¶45. He finds himself in this predicament because he came from South Carolina to California to join his co-defendant, and adopted brother, Jose Luis. PSR, ¶45.

Having spent 17 years here without any law enforcement contact is remarkable for a US citizen, let alone an alien with no lawful status. Mr. Arteaga-Vasquez's good moral character shines when the gravity of that "accomplishment" is considered.

Additionally, Mr. Arteaga-Vasquez will be, upon judgment and sentencing, an aggravated felon in immigration parlance. *Salviejo-Fernandez v. Gonzales*, 455 F.3d 1063 (9th Cir. 2006) Thus, he will be subject to mandatory detention and certain removal/deportation back to Honduras. In fact, he fully expects that to be his fate. PSR, ¶47. To his credit, though, he mentioned to USPO Goldsberry that - even after deportation - he will seek employment as soon as he can. PSR, ¶47.

Thus, the Court sees before it a man whose internal moral compass has typically led him down the straight and narrow. A man whose main goal throughout life has been to provide for his family. A man whose immediate future after this case involves ICE seeking to return him to his native Honduras. A man who, despite working for 17 years here in the U.S. says "I have

CR 19-00287-CRB                                3

nothing" when asked about assets. PSR, ¶54. A man who appears before the Court solely because he joined his adopted brother in a pre-existing scheme. It is the defense position that such a man does not deserve to be sentenced according to a rigid, and artificial, rule of law.

## SAFETY VALVE

"Wishing it were so, doesn't make it so" are words to live by. The defense recognizes that - without more - wishing Mr. Arteaga-Vasquez could be sentenced to probation doesn't mean the Court can grant it even if it were so inclined. However, a safety valve proffer is scheduled for a time prior to sentencing. 18 U.S.C. §3553(f). Should the event occur, and should the Government agree that Mr. Arteaga-Vasquez was truthful in the process, the Court will have the imprimatur to sentence him in accordance with its own wisdom and sense of justice.

## CONCLUSION

Mr. Arteaga-Vasquez stands before the Court prepared to accept his fate. He understands that the Court must mete out punishment and may be bound by the inflexibility of the mandatory minimum governing this case unless he is determined to be safety valve-eligible. He stands before the Court at the same time, though, asking that the Court measure the degree of criminality he actually displayed and balance that with the impact on him - and society - that a lengthy period of incarceration will cause.

Imprisoning anyone who is likely to be deported/removed upon release is always a matter deserving of deeper analysis. Whether it is sensible to spend resources locking a person away as a form of punishment when returning that person to the homeland they desperately sought to leave is a far greater punishment is questionable under most circumstances. Here, where the person has the equities Mr. Arteaga-Vasquez has, imprisonment would seem to be counter-productive and not in society's best interests.

Furthermore, when the Bureau of Prisons has a horrendous problem dealing with the COVID-19 pandemic, incarceration should be seen as a last resort and avoided when possible. The Court is no stranger to COVID-19 litigation, but it bears repeating that the Center for Disease Control

and Prevention (CDC) recognizes the difficulty of managing the introduction of COVID-19 into prison facilities:

"There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions."

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons. Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators. Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-containcoronavirus

Thus, inserting Mr. Arteaga-Vasquez into such an unsettled environment is neither necessary, nor advisable, at the present time.

DATED: September 23, 2020          Respectfully submitted,

　　　　　　　　　　　　　　　　　　 */s/ James Phillip Vaughns*
　　　　　　　　　　　　　　　　　　 _____
　　　　　　　　　　　　　　　　　　 JAMES PHILLIP VAUGHNS
　　　　　　　　　　　　　　　　　　 Attorney for Defendant ARTEAGA-VASQUEZ

CR 19-00287-CRB                              5